United States *v.* Antilla Trading Co. (No. 4147)[1]

[1] C. A. D. 25.

United States Court of Customs and Patent Appeals, December 19, 1939

*Charles D. Lawrence*, Acting Assistant Attorney General (*Dorothy C. Bennett*, special attorney, of counsel), for the United States.

*Barnes, Richardson & Colburn* (*Samuel M. Richardson* of counsel) for appellee.

[Oral argument October 3, 1938, by Mrs. Bennett and Mr. Samuel M. Richardson]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, and LENROOT, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court: [2]

This is an appeal by the Government from the judgment of the United States Customs Court, Second Division, granting three petitions of the importer, appellee here, for remission of additional duties assessed under the provisions of section 489 of the Tariff Act of 1930 upon sixteen shipments of malangas, also called yautias, imported from Santo Domingo, Dominican Republic, through the port of New York.

The three petitions were consolidated in the trial court and heard together as a single case, it being agreed that all the entries present similar issues.

It appears that the importer was an individual by the name of Raymond Cerra who carried on his business under the name of "Antilla Trading Company," apparently not incorporated. The first entry was made March 28, 1934. [3] Thereafter entries were made each month of that year up to and including August, the last being August 6, 1934. The entries were made through a customs broker, styled on the entry papers "Leonard W. Moritz Co." Leonard W. Moritz seems personally to have made the entries and was a witness in the case, being called by counsel for the importer. He was instructed by Cerra as to the value at which to make the entries.

In each of the cases the entered value of the merchandise and the final appraised value was less than $100. Consular invoices, therefore, were not required. Section 482 (a), Tariff Act of 1930. So, the entries were made upon so-called *pro forma* invoices. Section 498 (a) (1), Tariff Act of 1930. These invoices were prepared by the broker upon the basis of importer's instructions, which instructions were to enter the merchandise at the value of 75 cents per 100 pounds. From

[2] JACKSON, Judge, took no part in the consideration or decision of this case.

[3] The opinion of the trial court paraphrases certain testimony of the party Cerra to the effect that he began making importations in May 1934, but itself makes no specific findings as to when he began. The papers show one entry in March 1934 and two in April 1934, and the bulk of the testimony, in fact, relates to these early entries.

the record it appears that in the ordinary course of business the malangas were imported in bags, the filled bag weighing 150 pounds. The entered value, therefore, was the equivalent of $1.12½ per bag. The appraiser advanced the value for duty purposes to $1.79 per bag, the equivalent of $1.19⅓ per 100 pounds.

The price actually paid by the importer to the shipper was $3.10 per bag c. i. f. New York, the shipper having made drafts for this amount. It is not altogether clear when the early importations came under the observation of the appraiser for appraisement but they received the attention of an examiner at least as early as May 1934. The decisions of the local appraiser advancing the value were not finally made until a time in 1935; something more than a year after those early entries. All sixteen of the shipments were then advanced in value. The importer appealed for reappraisement in all the cases, but abandoned such appeals, apparently on the advice of counsel, and same were dismissed in 1936 by the single judge to whom they had been assigned for trial. The final liquidations in which the additional duties, remission of which is sought in this proceeding, were assessed took place in July and August 1936.

It is conceded that the merchandise was undervalued in the entries, but it is claimed that such action "was without any intention to defraud the revenue of the United States or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise."

That contention comprises the only issue in the case, as finally presented to this court. The Government in its appeal did assign errors relating to the exclusion by the trial court of certain testimony and a certain document offered in evidence, but these assignments were not stressed in the brief, and in the oral argument before us counsel for the Government expressly waived them. So, we are not called upon to consider them.

The importer Cerra testified in his own behalf, and his counsel called as witnesses another importer of this type of merchandise, by the name of Miguel A. Ramirez, and the broker, Moritz. The Government introduced the testimony of Henry Knapp, a customs examiner, who examined the involved importations, and Frank B. Laughlin who, at the time of testifying, was a deputy collector of customs at the port of New York, but who from 1932 to 1936 was a customs agent.

It is quite aptly said in the beginning of the decision of the trial court that "The record in this case is very cumbersome and prolix." We have found it so. During the taking of the testimony there were numerous objections by counsel for both parties, followed in many instances by argument pro and con, before the court ruled, and it

must be said that there are numerous contradictory statements, particularly by the importer.

Cerra began his testimony by stating, in substance, that he, doing business as "Antilla Trading Company," commenced importing malangas in May 1934, saying that before that time he had been buying from other importers. In answer to a question by his counsel, "Had you made any importations prior to the first one in May 1934," he answered "No."

As has been stated in the footnote, *supra*, there were three importations entered by Antilla Trading Co., with Cerra declaring himself as purchaser, as shown by the entry papers of record, prior to that time.

Immediately following the above quoted question and answer, the record shows the following:

Q. When you got your invoice, or whatever you may call it, of this merchandise, did you go and see the government examiner?—A. Yes.

In view of the direct connection between the first and last quoted questions and answers, the fair presumption would seem to be that the invoice referred to in the last question was an invoice of the first May importation which appears to have been entered May 7. Other testimony later referred to, however, indicates that the invoices were those of the earlier shipments.

Cerra's testimony continued:

Q. Who was that government examiner?—A. Mr. Knapp.

Q. Did you have any conversation with him about the value that you should enter this merchandise at?—A. Yes.

Q. Will you state what that conversation was?—A. I asked him at what price I should make the entries.

Q. What did he tell you?—A. Seventy-five cents a hundred pounds.

Judge KINCHELOE. Seventy-five cents what?

The WITNESS. A hundred pounds.

Q. Did you know at that time—you didn't know at that time that there was an investigation of the value of malangas being made by the Government?—A. I did not.

Q. Did he tell you any such thing at that time?—A. No.

Q. Accordingly, did you direct your broker, Leonard Moritz & Company, to make entry at seventy-five cents per hundred pounds?—A. Yes. And he called on the telephone to Mr. Knapp and asked him the same thing; how much he is supposed to make the entries.

Q. That is what he told you?—A. Yes.

Q. You directed your broker to enter this merchandise at seventy-five cents per hundred pounds all during these entries involved in these petitions?—A. Yes.

Q. That was all done under your direction?—A. Yes.

Q. Did you know other importers of this merchandise?—A. Yes.

Q. Did you know Mr. Domingo?—A. Yes.

Q. Did you know Mr. Ramirez?—A. Yes.

Q. Did you at the time you made the first importation make any inquiry of them as to what they had paid for their merchandise? Answer yes or no, Mr. Cerra.—A. No.

Q. You did not inquire of them as to what they paid for their merchandise?—A. No.

Q. Did you make any inquiries as to what price they were entering their merchandise for customs purposes?—A. Yes. I asked Mr. Domingo and I asked Mr. Ramirez, too.

Q. Any others?—A. No; no others. Only Mr. Domingo and Mr. Ramirez and they told me seventy-five cents a hundred pounds.

Q. I see.—A. But I was in doubt because they was competitors. I used to buy malangas from Mr. Ramirez and Mr. Domingo.

Q. Prior to the time you imported them?—A. Yes. I was in doubt what they was telling me, seventy-five cents a hundred pounds, because they was competitors, and then I went to see Mr. Knapp and afterwards to see Mr. Moritz.

Q. The broker?—A. The broker, yes; and told him seventy-five cents a hundred pounds.

Q. He told you that Mr. Knapp told him the same thing; is that right?—A. That is right.

Q. Mr. Cerra, in making your entries, or directing your broker to enter this merchandise at seventy-five cents per hundred pounds which was less than the value at which it was finally appraised, did you intend to defraud the Government of the United States?

Mr. SPECTOR. I object to that as calling for a conclusion.

Judge KINCHELOE. The Court of Appeals has said specifically that it is competent. Overruled.

A. No.

There then appears the following perplexing testimony by this witness:

By Mr. RICHARDSON:

Q. Did you conceal any information from the examiner as to the value of this merchandise? Did you tell Mr. Knapp everything he asked you about the value of this merchandise? Did you tell him everything that he asked you?—A. No.

Q. Did you answer every question he put to you about the value of this merchandise? Do you understand what I mean?—A. I cannot get it clear.

Judge KINCHELOE. Did he ask you any questions about the value of this merchandise; the examiner?

The WITNESS. Well, he asked me the cost of my malangas, and I told him seventy-five cents a hundred pounds.

Judge DALLINGER. Did you ever refuse to answer any questions he asked you?

The WITNESS. No.

Judge DALLINGER. Did you conceal any information you had from him?

The WITNESS. Yes.

Judge DALLINGER. Did you have any information you did not tell him about?

The WITNESS. Oh, no.

Cerra testified further that he received a bill from the shipper in Santo Domingo for the malangas at a price of $3.10 per bag c. i. f. New York, but did not state the date of its receipt. The following then appears:

Q. Did you receive any information from him [the shipper] as to what the value of malangas was in Santo Domingo?—A. Yes; I did.

Q. What was that information?—A. I asked him to send to me the prices of the malangas in Santo Domingo and he sent me a bill for the cost of malangas at seventy-five cents a hundred pounds.

On cross-examination, without any reference being made to the statement by Cerra that no importations were made before May 1934, Government counsel proceeded to inquire, among other matters, about a draft "for this merchandise * * * purchased on March 27, 1934,"—20 bags. This entry is embraced in the first of the three petitions. To the testimony respecting this we shall have occasion to refer later. The point immediately under consideration here is that of the time when the conversation occurred between Cerra and Examiner Knapp.

Importer's witness Ramirez corroborated Cerra's statement to the effect that Cerra inquired of him as to the value at which he, Ramirez, was making entries of malangas and was told at 75 cents per 100 pounds. Ramirez did not fix the time of that conversation other than as it was fixed by Cerra, his testimony upon the point being confined to the following:

Q. Did you hear Mr. Cerra's testimony as to a conversation with you in reference to the value at which you were making entries of malangas?—A. I did.
Q. Is that testimony correct?—A. Correct.
Q. Did you make such statements to him?—A. I did; correct.

The testimony of the broker, Moritz, is to the effect that he made all the entries himself, preparing the *pro forma* invoices; that before he made entry of "the first lot or two or three lots" he did not see Cerra, but that Cerra "called up and he said he had some malangas"; that he asked Cerra about the value and Cerra said it was 75 cents per 100 pounds, and that at the time of the conversation with Cerra, or shortly after and before he made any of the entries, he had a conversation with Examiner Knapp.

His testimony relating to the conversation with the examiner on direct examination was:

Q. What was that conversation you had with Examiner Knapp?—A. I called up Mr. Knapp and I said I had some malangas and the value given to me by the importer was 75 cents a hundred pounds.
Q. Did you ask him whether he had any value for this merchandise? I am referring to that conversation you had with Mr. Knapp.—A. I asked Mr. Knapp what he thought of this value.
Judge TILSON. Go ahead and tell us about that conversation; what you said to him and what he said to you.
The WITNESS. Mr. Knapp said, "I don't know. I cannot tell you what the value is just now."

By Mr. RICHARDSON:
Q. Did he say anything to you about an investigation being made?
Mrs. BENNETT. In point of time. When was that?
Mr. RICHARDSON. In this same conversation in March, at that same time.
A. This is supposed to be before the first entry. Before I made any entry I did not obtain any information. That is the only thing he said, "I cannot tell you what the value is just now."

By Mr. RICHARDSON:

Q. Did he tell you or say anything to you about an investigation being made as to value?—A. I don't remember him saying anything about an investigation. I know we had to put up a bond. I suppose that meant an investigation. We had to put up a bond. I suppose that meant an investigation. I do not remember he told me anything about an investigation.

Q. Did Mr. Knapp say anything to you about amendments to these entries of this merchandise?—A. Yes.

Q. What did he say?—A. Well, he said you had better use that value and we can adjust the value later and amend the entries.

On cross-examination the material parts of the testimony of this witness were to the effect that the *pro forma* invoices which he prepared showed the flat price of 75 cents per 100 pounds and no nondutiable charges, nor any prices other than said 75 cents; that he never discovered that the importer paid a higher price for the merchandise, not having read the testimony which Cerra had previously given and not having read any bank drafts or papers showing what amounts Cerra paid, and that it had been his experience "in handling perishable merchandise you have to act quicker in making your entry to get the merchandise out of the way."

On redirect examination he stated, in substance, that it had been the practice to allow amendments of entries on perishable merchandise.

On recross-examination he testified as follows:

Recross examination by Mrs. BENNETT:

R. X Q. Did you ask this importer for his commercial invoice at or prior to the time you made entry at 75 cents per hundred pounds?—A. I asked him if he had a commercial invoice but I got no reply. He said the price was 75 cents a hundred pounds. I asked him to get the commercial invoices but I got no reply.

R. X Q. Did you ever get any from him?—A. No, ma'am.

R. X Q. You never got them?—A. No.

R. X Q. Neither for the first entry nor the last entry, nor any of them?—A. I have not received any commercial invoice

The witness was then questioned by Judge Kincheloe of the trial court and asked to detail again the conversation with Examiner Knapp. He replied:

If I remember clearly I said to Mr. Knapp, "I have some malangas and the price given to me by the importer is 75 cents a hundred pounds." And Mr. Knapp said, if I remember clearly, "I would have no information in the price. Better use that value and amend the entry later." It might not have been in those words but that was the substance of it. "Use that value and amend the entries or adjust the prices later."

Examiner Knapp, called on behalf of the Government, testified, in substance, that it was a part of his duty to examine malangas; that in April 1934 he received an anonymous letter (concerning the contents of which he was not permitted to testify) that led him on May

18, 1934, to ask for an investigation as to the export value of malangas in Santo Domingo; that shortly after the receipt of the letter and a few days before May 18, 1934, he called the importer, Cerra, and asked him to "bring in his commercial invoices and correspondence" in the cases presented by the entries of March 28, April 23, and April 30—apparently all the entries which had then come to his attention— and that Cerra did so.

After considerable wrangling by counsel and discussion by the court, there were admitted in evidence, as Exhibits 1, 2, and 3, respectively, three papers headed "Memorandum," but being in the form of statements, or bills, rendered by the exporter in Santo Domingo to the importer in New York. Those are the papers seemingly referred to as the "commercial invoices." Parts of the matter printed and typed upon them are in Spanish but all that is pertinent is easily understood. The one of March 28 (omitting the column lines) reads in part, "a 20 s/c. yatias de 150 Lbs. c/. 30 qqles. a $0.75 qql. $22.50." Except for dates and amounts, Exhibits 2 and 3 are substantially the same as Exhibit 1; Exhibit 2 is dated April 17, 1934, and Exhibit 3, April 24, 1934. Each is a statement for twenty-five bags at $0.75 per 100 pounds, the total amounts being stated as $28.12 each. Accompanying each of these bills and attached thereto as a part of the exhibit is a canceled draft drawn upon importer through the Royal Bank of Canada. The draft accompanying Exhibit 1 was dated March 22, 1934, and was for $62. Those attached to Exhibits 2 and 3 were dated, respectively, April 18, 1934, and April 25, 1934, and were for $77.50 each. Endorsements upon the drafts show that each was promptly paid. A simple mathematical calculation discloses that the amount named in the drafts covers the respective importations at $3.10 per bag of 150 pounds.

The testimony of examiner Knapp relative to the conversation between himself and importer Cerra, at the time of the production before the former by the latter of the so-called commercial invoices and the drafts, was to the effect that importer could not explain the discrepancies between the invoice prices and the amounts of the drafts.

The examiner thereupon asked for the investigation already alluded to as to export value in Santo Domingo and the matter went into the hands of customs agent Laughlin who began his investigation in New York and afterwards visited Santo Domingo. We deduce that largely as a result of the report following this investigation the advancement over the entered value was made, but only a small part of the testimony which the Government sought to elicit from Laughlin was admitted, the bulk of it being refused as hearsay, or for other reasons. Since the assignments of error as to such refusal were waived before us, we have no occasion to consider any question concerning it.

Laughlin was permitted to testify that just prior to, or in the early part of December 1934, he visited importer's place of business and had an interview with Cerra, certain parts of which Laughlin detailed, but Cerra was called to the stand in rebuttal and denied that he ever saw Laughlin at his [Cerra's] place of business, or showed him any papers there (saying the only time he ever saw him was at a meeting in the customs house about which meeting all testimony already had been excluded), and subsequently Laughlin addressed a letter to the Assistant Attorney General, saying, in effect, that while at the time he thought it was Cerra he was interviewing, it might have been someone else, and adding:

\* \* \* On full consideration I believe Mr. Cerra's denial that he ever saw me in the store is made in good faith.

If consistent with your policy and legally proper, I will appreciate correction of my testimony to substitute "the proprietor of Antilla Trading Company" for "the defendant" or a "Mr. Cerra" wherever the latter appear as the parties interviewed.

It was stipulated by counsel for the respective parties that the testimony alluded to might be corrected according to the request and this was approved by the trial court.

In Cerra's cross-examination by Government counsel he was questioned quite closely about his efforts to ascertain freight and other charges contained in the $3.10 per bag c. i. f. New York price, but asserted his inability definitely to state them. He stated that he made inquiries as to the price of this merchandise in Santo Domingo, but there was no very definite showing as to where or of whom such inquiries were made. At another point he stated that he did not go to Santo Domingo but went to Cuba and Porto Rico. Asked by Judge Dallinger of the trial court—"But you made inquiry in Santo Domingo," the witness answered, "No, sir; in Porto Rico and Cuba." In the testimony of the witness as to the conversation between Knapp and himself, during cross-examination, appears the following:

Judge DALLINGER. Did I understand you to say that you brought the examiner the draft and other papers he asked you to bring?
The WITNESS. Yes, sir.
Judge DALLINGER. Did he say anything to you at that time?
The WITNESS. He asked me——
Judge DALLINGER. Did he say anything to you?
The WITNESS. Mr. Knapp?
Judge DALLINGER. Yes.
The WITNESS. He did.
Judge DALLINGER. What did he say?
The WITNESS. He asked me what I paid in Santo Domingo and I told him seventy-five cents a hundred pounds. He asked me for the invoice and I brought the invoice from Santo Domingo and besides I brought the draft.
Judge DALLINGER. When you brought those documents, did he say anything to you?

The WITNESS. He didn't tell me anything. He told me about an investigation in Santo Domingo.

Judge DALLINGER. He didn't say anything to you after you brought those papers?

The WITNESS. He kept the papers. I did not bring papers because I left the papers over there.

It was found by the trial court that—

\* \* \* examiner Knapp never contradicted the witness Moritz that he [Knapp] told him [Moritz] he did not know what the correct dutiable value of the merchandise was, but that he would advise said Moritz to enter same at 75 cents per 100 pounds and that the entry thereafter could be amended if necessary.

Elsewhere the court says, in substance, that the opportunity to amend the entries "was never afforded the petitioner." Upon this it may be said that no evidence is found of record that petitioner ever sought to amend any of the entries, the very last of which (that of August 6, 1934) was pending for several months before its final appraisement. It is proper to repeat that the record does not disclose the time when the invoices of the merchandise actually passed under the observation of the *appraiser*, as distinguished from the examiner, for appraisement. It is the duty of the *appraiser*, not the examiner to appraise merchandise, and the statute provides for amending the entries only "before the invoice or the merchandise has come under the observation of the appraiser for the purpose of appraisement." Section 487, Tariff Act of 1930. Apparently the final appraisements were not made earlier than in September 1935. So, it is evident that there was a considerable period in which the importer might have amended the entries had he chosen to do so.

The ultimate question to be determined judicially in cases such as this, is whether where additional duties are assessed by the collector under section 489 because an importer undervalues merchandise upon entry and later contends that such undervaluation was not made with any intention to defraud the revenue or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise, such contention is supported by satisfactory evidence. If it be judicially determined that such contention is supported by satisfactory evidence, it is made the duty of the collector, upon being advised of such finding, to remit or return the additional duties assessed; otherwise, it is provided that such duties "shall not be remitted nor payment thereof in any way avoided."

As was said by the Supreme Court of the United States in the case of *United States* v. *Fish*, 268 U. S. 607, the question presented is, "Has the importer sustained the negative in this regard?" That court then further said, "Both the importer and the Government are entitled to a finding either that there was no intent to defraud or that the importer did not sustain his burden that there was no such intent."

In the instant case, the trial court made a specific finding and held in effect that satisfactory evidence had been offered to sustain importer's burden of showing the negative.

This court is extremely reluctant to reverse the trial court upon findings made under circumstances such as those here existing, but we find ourselves unable to agree that the evidence, the full substance of which we have endeavored fairly to state, is satisfactory and, therefore, sufficient to sustain the burden, as described in various decisions, resting upon the importer. In the case of *Wolf & Co.* v. *United States*, 13 Ct. Cust. Appls. 589, 591, T. D. 41453, after citing various authorities, this court said:

Summarized, these adjudged cases announce certain fundamental facts which the petitioner must establish if he is to obtain relief: First, he must show that in undervaluing his goods he was acting in entire good faith; second, that there were no facts or circumstances known to the petitioner when he made his entry which would cause a prudent and reasonable person to question the correctness of the values given by him; third, that he has made to the collector in making his entry, a full and candid disclosure of all the material facts in his possession bearing upon the value of the merchandise imported.

We have consistently held that the burden rests upon the petitioner for remission to present satisfactory evidence respecting the foregoing requirements. *Stone & Downer* v. *United States*, 13 Ct. Cust. Appls. 649, T. D. 41488; *United States* v. *North American Mercantile Co.*, 14 Ct. Cust. Appls. 68, T. D. 41578; *National Biscuit Co.* v. *United States,* 20 C. C. P. A. (Customs) 395, T. D. 46187; *United States* v. *Pennsylvania Salt Manufacturing Co.* (suit 4144), 26 C. C. P. A. (Customs) 232, C. A. D. 22.

It may be that much of the confusion in the testimony of importer Cerra grew out of his inability clearly to understand the meaning of some of the questions asked him, and that some of his contradictory statements were due to the same cause. We are not disposed to judge harshly because of such confusion and contradictions. The testimony in which those appear related largely to matters occurring subsequent to the dates of the three early entries which have been described, and, primarily, the question to be determined relates to the state of mind of the importer at the time he caused the entries to be made. Subsequent acts and conduct may be looked to only for such light as they may throw upon his state of mind at the time he made the entries. All other things aside, the undisputed fact stands out that at the time he caused his broker to make the first three entries (and, as indicated above, we have no testimony relating specifically to the facts and circumstances surrounding the later entries) he had in his possession, and seemingly had paid, or was about to pay, drafts showing that the merchandise actually cost him $3.10 per 150-pound bag c. i. f. New York, the equivalent of $2.07 per 100 pounds. It is doubtless true

that the prices so paid included nondutiable items, and it may be that Cerra did not know just what such nondutiable items were, but it does not appear that he made any effort to ascertain what they were.

From his testimony quoted above *verbatim*, it appears that the inquiries he made of Domingo and Ramirez, before he made any importations, related only to "what price they were *entering* their merchandise *for customs purposes* [italics ours]," and he added, in substance, that he was *in doubt* as to what they were telling him ("seventy-five cents a hundred pounds") because they were competitors. There is no satisfactory evidence that he voluntarily made any inquiries actually pertinent to the issue, before or at the time of the importations and entries.

Since the papers in Cerra's possession fully informed him of the pertinent facts recited, we are unable to conclude that, by satisfactory evidence, he met the burden of showing that there were no facts or circumstances known to him, when he made his entries, which would cause a prudent and reasonable person to question the correctness of the values given by him. Further, we are unable to conclude that he has met the burden of showing by satisfactory evidence that, in making his entries, he made to the customs authorities a full and candid disclosure of all the material facts in his possession bearing upon the value of the merchandise imported. Under the rule stated in the *Wolf* case, *supra*, and consistently applied by the court, the burden of showing these prerequisites rests upon a petitioner.

We are forced to the conclusion, under the authorities cited, that the finding below was erroneous.

Accordingly, the judgment of the United States Customs Court is *reversed*.